UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Paper Thermometer Company, Inc.
and Joseph D. Loconti,
    Plaintiffs

      v.                       Case No. 10-cv-419-SM
                                     Opinion No. 2012 DNH 017
Nathanael Murray, Individually
and d/b/a Dishtemp Safety Company;
William Duerig; and Cathleen L. Duerig,
    Defendants


**O R D E R**


Paper Thermometer Company, Inc. ("PTC") and its founder,
Joseph Loconti, manufacture adhesive temperature-sensitive labels
which, when exposed to certain temperatures, change color.  They
bring this suit against Loconti's daughter, Cathleen Duerig, and
her husband, William Duerig.  PTC and Loconti claim that the
Duerigs (who worked for PTC for many years, but are now retired)
misappropriated certain PTC trade secrets and subsequently
breached a covenant not to compete.  Plaintiffs also advance
claims against Nathanael Murray, asserting that he infringed
various PTC copyrights and engaged in false advertising while
attempting to establish a business which, plaintiffs say, was
meant to directly compete with PTC.  Plaintiffs seek injunctive
relief, compensatory and punitive damages, and an award of
attorneys' fees.  Primarily, however, they seek to rescind two

agreements with the Duerigs, which obligate Loconti to pay his daughter approximately $5 million.

The Duerigs deny any liability and move for summary judgment.  Murray has done the same.  For the reasons discussed below, those motions are granted to the extent they address plaintiffs' federal claims.  The court declines to exercise supplemental jurisdiction over plaintiffs' state law claims, which are dismissed without prejudice.

## Standard of Review

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with evidence that conflicts with that proffered by the moving party. See generally Fed. R. Civ. P. 56(c). It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, unsupported conclusions, and mere speculation. See Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997). See also Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## Background

PTC manufactures paper thermometers, which are then sold by Paper Thermometer Company, Ltd. ("PTC Ltd." or "the partnership"). Paper thermometers are chemically-coated, self-adhesive labels that change color when exposed to a set

3

temperature.  Such labels have a range of applications including, for example, verifying that a commercial dishwasher is generating sufficient heat to adequately sanitize a restaurant's dishes and glasses.

According to Loconti, he began manufacturing paper thermometers in 1953 and, in 1979, he incorporated his business as Paper Thermometer Company, Inc.  PTC is a family-owned business.  Loconti's three daughters (Antoinette, JoAnne, and defendant Cathleen Duerig) were equal (but not sole) shareholders.  The partnership, Paper Thermometer Company, Ltd., was formed in 1983 to sell PTC's products.  The three daughters were equal and sole partners.  Each of Loconti's daughters worked for PTC in various capacities, including sales, marketing, and customer relations.  Cathleen's husband, defendant William Duerig, worked for the company for 27 years, "as the principal employee responsible for manufacturing paper thermometers using PTC's confidential and proprietary formulas."  Plaintiffs' memorandum (document no. 65) at 2.  He retired in March of 2010.

The other defendant, Nathanael Murray, is a bartender at a restaurant where the Duerigs frequently dine.  At some point in 2008 - well before they left PTC - the Duerigs, while at the restaurant, were talking to Murray about their employment at PTC

4

and the products that PTC manufactures.  Murray has a young
daughter and a wife who was in school at the time, and he was
apparently interested in generating additional income for his
family.  So, he asked the Duerigs whether they needed any
additional sales or marketing people.  They told him that PTC did
not have such employees but, instead, sold products directly to
customers through its website.  Murray then asked whether it
would be possible to purchase products from PTC and re-sell them
to third parties.  The Duerigs told him that a number of the
company's customers did exactly that and they saw no reason why
Murray couldn't do the same.  <u>See, e.g.</u>, Deposition of Cathleen
Duerig (document no. 31-6) at 41 ("He said 'would I be able to do
something like that?'  I said, 'sure, anybody can buy labels and
resell them.'  So he said, 'I might like to do something like
that.  I could do it from home.' . . . So that's what I thought
of him as, just as a customer.  It wasn't like a business
dealing.  It was just he was going to buy our [PTC's] labels and
resell them.").

     Murray's interest was obviously piqued and, between 2008 and
2009, he set about establishing a business through which he could
resell PTC's paper thermometers to third parties.  He asked the
Duerigs if they could provide him with samples of PTC's products
- particularly those that could be used in the restaurant

industry - so he could test them and compare them with similar products on the market.  Not surprisingly, the Duerigs accommodated that request since, as Cathleen testified, they saw Murray as yet another potential customer of PTC and a source of additional revenue for the company.  And, because they were obviously friendly with Murray and wanted him to succeed in his business endeavors, they were willing to assist him.

Eventually, Murray's fledgling side business progressed to the point that he had settled upon a name (Dishtemp Safety Company), registered a second level domain name for a website, established a toll-free telephone number, and set up a PayPal account through which he could process customer payments.  But, when he published his website to the Internet in June or July of 2010, Murray admittedly used some misleading (or at least ambiguous) text which suggested that he was manufacturing labels, rather than merely reselling PTC's products.

Loconti and PTC have two principal complaints about Murray's website.  First, they say Murray included a quote from Food Safety Magazine extolling the virtues of PTC's paper thermometers, but omitted words from that quote that identified PTC as the manufacturer of those products.  See DishTemp Safety website (Document no. 79-7), at 2.  Next, they say the following

6

statements in the site's "About Us" section are false and misleading.

> From our tightly integrated sales and manufacturing facilities in southern New Hampshire, DishTemp Safety manufactures and distributes the most accurate commercial dishwashing temperature testing indicators available.  Our engineers have over 30 years of field tested experience.

<u>Id</u>. at 8.  As PTC and Loconti point out, Murray was not "manufacturing" anything, nor did he employ anyone, certainly not "engineers."  Murray concedes as much and, no doubt, by now fully regrets his use of misleading language.  But, for the reasons discussed more fully below, it is equally important to point out that <u>plaintiffs</u> knew (at the least, after some discovery in their case against Murray they knew) that Murray was not manufacturing any temperature-sensitive labels.  They also had to know within a short time after filing suit against Murray that even if Murray wanted to do so, he lacked the necessary engineering expertise to manufacture labels.  And, they also know that nothing in the record even hints that Murray <u>ever</u> expressed an interest in manufacturing temperature-sensitive labels in competition with PTC.  His plan all along was to purchase from PTC, and then resell labels that PTC manufactured - a sales business he could operate from his home with no technical expertise.  The record on that point is unarguable.

Although they acknowledge Murray's actual plan, and concede that it would be virtually impossible for him to manufacture paper thermometers, PTC and Loconti nevertheless continue to press their theory that Murray intended to enter the market as a competitor to PTC and/or planned to act as a "proxy" for the Duerigs in an alleged scheme to compete with PTC.  See, e.g., Plaintiffs' Opposition Memorandum (document no. 79-13) at 2-3. In short, rather than see the language of Murray's website for what it plainly was - hyperbole born of misguided youthful exuberance - PTC and Loconti choose to see it as evidence of a dogged conspiracy between Murray and the Duerigs to harm PTC (perhaps for reasons related to the note obligation).

Meanwhile, in early 2010, as Murray took steps to set up his business, both Cathleen and William Duerig left PTC and retired. When Murray asked them whether he would still be able to purchase and resell PTC's products, they told him that they saw no reason why he could not - their departure from PTC should not affect his business plan.  They suggested that he contact one of Cathleen's sisters at PTC, introduce himself, and explain his plan to purchase PTC labels and resell them to third parties.  In other words, because the Duerigs were leaving the company, Murray needed a new contact - a person from whom he could get

8

information he needed about the company's products and through whom he could place orders for items he wished to resell.

In April of 2010, roughly three or four months after they left the company, the Duerigs entered into a series of agreements with Loconti and PTC.  Pursuant to a Purchase and Sale Agreement (document no. 65-3), Loconti agreed to acquire all of Cathleen Duerig's outstanding shares of stock in PTC for $5 million, payable in equal annual installments over the course of five years.  He executed a promissory note documenting that obligation.

As part of the purchase and sale of Cathleen's stock, the Duerigs executed a covenant not to compete with Loconti, PTC, and PTC Ltd, with a retroactive effective date of January 1, 2010. The pertinent section of that agreement provides as follows:

> [Cathleen and William Duerig] jointly and severally
> agree, for a period of ten (10) years from and after
> the effective date of this Agreement, that neither
> shall, anywhere in the world, directly or indirectly,
> own, manage, operate, control, be employed in,
> participate in or provide financing for the ownership,
> management, operation, or control, or <u>assist or be
> connected in any manner with</u>, <u>any temperature-
> indicating device business</u>.

Non-Competition Agreement (document no. 36) (emphasis supplied). Assuming, for the moment, that the agreement is enforceable,

Loconti says his daughter and her husband breached its terms by "assisting" Murray in his efforts to establish a business whose purpose was reselling PTC's own products, and by plotting with Murray to exploit PTC's trade secrets to manufacture competing temperature-sensitive labels.  On that stated basis, Loconti apparently refused to make any payments under the purchase and sale agreement (and the related promissory note).[1]

At some point in early 2010, Loconti arranged for a third party to make two small purchases through Murray's website.  The products obtained were, of course, PTC-manufactured labels. Subsequently, Loconti and PTC brought this action against Murray and, shortly thereafter, they amended their complaint to assert claims against the Duerigs.  After being served, Murray promptly took down the DishTemp website and discontinued all activities related to that company.  He never turned a profit from the company; the start-up costs (establishing the website, registering the business name, acquiring a toll-free telephone number, etc.) all far exceeded the small amount of income he generated from the resale of PTC's products.  In fact, the only sales he ever made were to Loconti's agent, the third party who

---

[1]     By separate agreement, Cathleen's sisters agreed to acquire her interest in the partnership (PTC Ltd.) for $11.5 million.  <u>See</u> Withdrawal Agreement (document no. 65-2).  The sisters are not parties to this litigation.

placed two orders at Loconti's direction.  And, Loconti and PTC
necessarily concede that they have suffered no direct monetary
damages as a consequence of any of the defendants' actions.[2]

## Discussion

The federal causes of action advanced by Loconti and PTC
are, at best, weak and thinly supported.  And yet, they insist on
pressing seemingly outlandish assertions, like the following:
"The Duerigs having agreed not to compete with PTC, the <u>evidence
indicates</u> that defendant Nathanael Murray <u>acted as their proxy</u> in
starting a <u>competing company</u> intended to <u>manufacture</u> and sell
paper thermometers in <u>competition with PTC</u>."  Plaintiffs'
memorandum (document no. 65) at 3 (emphasis supplied).  In other
words, Loconti and PTC advance a theory under which Murray was
not merely a retail <u>customer</u> of PTC who was simply planning to
resell its products through an Internet-based business he ran out
of his home.  Instead, say plaintiffs, Murray intended to operate
a <u>manufacturing</u> facility, entice William Duerig out of
retirement, exploit Duerig's knowledge of PTC's trade-secret
chemical formulas, and enter the market as a <u>competitor</u> to PTC -

---

[2]    As discussed more fully below, PTC and Loconti do
assert that attorneys' fees and costs associated with pursing
their legal claims against <u>Murray</u> constitute "actual damages" for
which <u>the Duerigs</u> are liable under both the Copyright Act and the
Lanham Act.

all in violation of Duerig's covenant not to compete (thereby

exposing Duerig to a substantial risk of monetary loss).

The so-called "evidence" upon which plaintiff's rely in

support of their conspiracy theory consists of the following:

> (1) Bill's [Duerig's] position as PTC's principal
> employee responsible for manufacturing paper
> thermometers using PTC's confidential and proprietary
> formulas; (2) statements made by both Bill and Cathleen
> that Bill had copied the documents reflecting the
> formulations; (3) the advanced age (94 years old) of
> the developer of the formulations, Loconti; (4)
> statements by Bill and Cathleen that PTC would have
> difficulty operating if Bill left; and (5) Bill and
> Cathleen's anger and animosity towards Loconti.

Plaintiffs' memorandum (document no. 65) at 2.[3]  Additionally,

plaintiffs point to the DishTemp website, which "portrays

DishTemp as a manufacturing company with Bill as the engineer."

Id. at 5.

And, finally, plaintiffs rely on the fact that, when he left

PTC and removed his personal belongings from his office, one page

of a "log sheet" - the documents on which Loconti maintained

PTC's collection of proprietary chemical formulas - was among the

---

[3]     Parenthetically, the court notes that plaintiffs
concede that the conversations in which the Duerigs allegedly
said William copied certain chemical formulas occurred between 15
and 20 years ago.  See, e.g., Deposition of Joanne Garvey
(document no. 33) at 48-60.

papers Duerig removed.  Duerig says he removed that document from PTC inadvertently and realized it was in his possession only after he began gathering materials requested by plaintiffs during discovery.  And, once he discovered that he had that document, he dutifully turned it over to plaintiffs.  But, say plaintiffs, Duerig was never allowed to have access to the log sheets and, therefore, should not have had any copies - even a single page. They speculate that a reasonable trier of fact might infer that because Duerig had one page of a log sheet in his possession, it is likely he had others (which, under plaintiffs' theory, were not turned over during discovery).

In their Amended Complaint (document no. 15), Loconti and PTC advance six counts, in which they allege the following:

**Count 1**:  Copyright Infringement (17 U.S.C. § 501). Murray copied plaintiffs' copyrighted website and packaging materials;

**Count 2**:  Contributory Copyright Infringement (17 U.S.C. § 501).  The Duerigs encouraged and/or induced Murray's infringement of PTC's copyrights;

**Count 3**:  False Advertising (22 U.S.C. § 1125).  Murray used false and/or misleading statements on his website, falsely suggested PTC products were his own, and the Duerigs materially assisted such false advertising;

**Count 4**:  Breach of Contract.  The Duerigs breached the terms of the non-competition agreement with PTC, Loconti, and the partnership;

**Count 5**:  Fraud in the Inducement.  The Duerigs made materially false representations in connection with the

13

execution of the Purchase and Sale Agreement (and
related promissory note), in that they falsely
represented that they would not compete with PTC in the
future; and

**Count 6**:  Theft of Trade Secrets (N.H. Rev. Stat. Ann.
350:B-1).  William Duerig copied PTC's secret chemical
formulas and never returned them.

The Duerigs and Murray move for summary judgment, asserting that
they are entitled to judgment as a matter of law with respect to
each of plaintiffs' claims.

I.    Plaintiffs' Federal Claims.

A.    Monetary Relief and Attorneys' Fees are Unavailable.

Murray published the DishTemp website in or before July of
2010.  Although PTC had been operating its own website prior to
that date, PTC did not apply for registration under the Copyright
Act until September 1, 2010 - i.e., well after the DishTemp site
was already up and running.  Consequently, PTC cannot recover
statutory infringement damages or attorneys' fee under the
Copyright Act, 17 U.S.C. §§ 504(a) and 505.  See 17 U.S.C. § 412.
See also Latin Am. Music Co. v. Am. Society of Composers, Authors
& Publishers, 642 F.3d 87, 90 (1st Cir. 2011) ("Section 412 bars
recovery of statutory damages under section 504 and attorneys'
fees under section 505 by copyright owners who failed to register
the work before the alleged infringement began.").  Moreover,
plaintiffs concede that they have not suffered any actual damages

14

as a result of Murray's alleged copyright infringement - at least
not "actual damages" in the traditional sense of the phrase.

So, plaintiffs are left with the following claims for relief
under the Copyright Act.  First, they say they are entitled to
prospective injunctive relief, to prevent any such similar
infringement in the future.  Additionally, they say they are
entitled to recover from the Duerigs - as "actual damages" - the
costs and attorneys' fees incurred in suing Murray.  According to
plaintiffs:

> Where a party is seeking to recover the damage it
> incurred in being forced by defendants' acts to pay
> attorneys' fees to sue a third party, under Harkeem v.
> Adams, [117 N.H. 687 (1977)] and the Restatement [of
> Torts], the plaintiff is not seeking its attorneys'
> fees incurred in prosecuting the claim against the
> subject defendants, but seeking to recover for the
> monetary harm incurred in being forced to sue another.

Plaintiffs' Sur-reply Memorandum (document no. 84) at 5.

As to the latter argument, plaintiffs have not pointed to a
single decision under the Copyright Act (or the Lanham Act) in
which a court has embraced that construction of "actual damages."
Instead, they rely upon common law principles articulated in
Harkeem, as well as a provision in the Restatement (Second) of
Torts, and a case involving breach of an insurance contract and
negligence, decided under Massachusetts common law.  See Mutual

Fire, Marine & Inland Ins. Co. v. Costa, 789 F.2d 83 (1st Cir. 1986).  The Restatement provides, in relevant part, that:

> One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

Restatement (Second) of Torts, § 914 (emphasis supplied).  As an example of that principle, the Restatement provides the following:

> With knowledge of their source, A sells stolen goods to B, who believes A to be the owner.  B is arrested but not convicted on the charge of having received the stolen goods with knowledge that they were stolen.  He is also sued for conversion by the true owner.  B can recover [from A] the amount that he reasonably expends in defense of both the tort and the criminal proceedings and in satisfaction of any judgment against him.

Restatement (Second) of Torts, § 914, Illustration 1.


In Mutual Fire, the court of appeals was presented with a somewhat similar situation.  An insurance agent negligently failed to update an insured's policy.  When the insured made a claim under that policy, the insurer denied coverage and filed a declaratory judgment action in federal court, naming the insured as a defendant.  The insured then filed a third-party action against the insurance agent.  The insurance company prevailed in

16

the declaratory judgment action and the court held that the
insured was not entitled to coverage.  But, the insured prevailed
against the insurance agent for having negligently failed to
update the policy.  Invoking Section 914 of the Restatement
(Second) of Torts, the court of appeals held that, under
Massachusetts common law, the insured was entitled to recover
from the insurance agent the attorneys' fees the insured had
incurred in defending against the declaratory judgment action
filed by the insurance company.  <u>Id</u>. at 88-90.  In other words,
because the insurance agent's negligence <u>required</u> the insured to
defend the declaratory judgment action, the court of appeals
reasoned that the costs and attorneys' fees the insured incurred
in that litigation were properly viewed as "damages" that could
be recovered from the insurance agent.

     When, as in <u>Mutual Fire</u>, a party is forced to <u>defend</u> an
action as a result of the wrongful conduct of a third party,
application of the principle articulated in the Restatement is
relatively straight-forward.  In those circumstances, it is
reasonable to say that the party was "required" to incur
litigation costs and attorneys' fees because it was (unwillingly)
named as a defendant in a lawsuit.  But, when (as in this case) a
party <u>initiates</u> suit and later seeks to recover costs and fees
incurred in that litigation as "damages" from a different party,

appropriate application of the principle articulated in the
Restatement is less clear.

Although invoked by Loconti and PTC in support of their
broad view of "actual damages," the holding in <u>Harkeem</u> counsels
against allowing plaintiffs to recover costs and fees incurred
pursuing claims against Murray as damages in their action against
the Duerigs.  In that case, the New Hampshire Supreme Court held
that:

> [w]here an individual is <u>forced to seek judicial
> assistance</u> to secure a <u>clearly defined and established
> right</u>, which should have been freely enjoyed without
> such intervention, an award of counsel fees on the
> basis of bad faith is appropriate.  <u>This principle
> . . . merely shifts the cost of what should have been
> an unnecessary judicial proceeding to the responsible
> party</u>.

<u>Harkeem</u>, 117 N.H. 691 (citation omitted)(emphasis supplied).
More recently, the New Hampshire Supreme Court explained that:

> The recognized scope of authority to award fees thus
> expanded from compensation for those who are forced to
> litigate in order to enjoy what a court has already
> decreed, to include compensation for those who are
> <u>forced to litigate</u> against an opponent whose position
> is <u>patently unreasonable</u>.  In such cases a litigant's
> <u>unjustifiable belligerence or obstinacy</u> is treated on
> an objective basis as <u>a variety of bad faith</u>, and made
> just as amenable to redress through an award of counsel
> fees as would be the commencement of litigation for the
> sole and specific purpose of causing injury to an
> opponent.  Thus we have recognized a constitutionally
> created court's power to award counsel fees in any
> action <u>commenced, prolonged, required or defended</u>

18

> <u>without any reasonable basis</u> in the facts provable by
> evidence, or any reasonable claim in the law as it is,
> or as it might arguably be held to be.

<u>Keenan v. Fearon</u>, 130 N.H. 494, 501-02 (1988) (citations omitted)

(emphasis supplied).


Read together, the principles established in <u>Harkeem</u> (and

its progeny), as well as those articulated in the Restatement,

counsel against embracing plaintiffs' theory of recovery in this

case.  Nothing in the record suggests that plaintiffs were

"required" to file suit against Murray in order to vindicate

their rights.  In fact, just the opposite is true - the record

suggests that if plaintiffs had simply contacted Murray,

explained their position, and asked him to either modify or shut

down his website, he would have immediately complied, as he did

when he learned of the lawsuit.  Alternatively, plaintiffs could

have employed the routine practice of sending a "cease and

desist" letter, which also would likely have produced the same

result as service of the complaint produced - prompt cessation of

all infringing activity by Murray.  Had plaintiffs taken either

of those simple (and comparatively inexpensive) steps, they

likely would have avoided all the costs and attorneys' fees they

now seek to recover as "damages" from the Duerigs.  Having failed

to do so, they cannot plausibly assert that the Duerigs'

allegedly wrongful conduct "required" them to incur substantial

costs and attorneys' fees in litigation against Murray.  Finally,
this is not a case in which plaintiffs were required to first
obtain a judgment against Murray as a condition precedent to
bringing suit against the Duerigs.

With regard to their false advertising claims under the
Lanham Act, plaintiffs must establish that:

> (1) the defendant made a false or misleading
> description of fact or representation of fact in a
> commercial advertisement about his own or another's
> product; (2) the misrepresentation is material, in that
> it is likely to influence the purchasing decision; (3)
> the misrepresentation actually deceives or has the
> tendency to deceive a substantial segment of its
> audience; (4) the defendant placed the false or
> misleading statement in interstate commerce; and (5)
> the plaintiff has been or is likely to be injured as a
> result of the misrepresentation, either by direct
> diversion of sales or by a lessening of goodwill
> associated with its products.

Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d
302, 310-11 (1st Cir. 2002) (emphasis supplied) (citation
omitted).  See also Quabaug Rubber Co. v. Fabiano Shoe Co., 567
F.2d 154, 161 (1st Cir. 1977) ("In order to recover damages for a
section 1125(a) violation, the aggrieved party must show that it
suffered actual harm to its business.").  Again, however,
plaintiffs suffered no cognizable harm as a result of Murray's
alleged false advertising or the Duerig's alleged facilitation of
Murray's conduct.  In these odd circumstances, product quality

was entirely consistent with PTC's standards since the product
Murray intended to sell was PTC's product.  No sales were
diverted, but even if some customers had purchased from Murray
rather than from PTC, Murray still would have had to first buy
the products from PTC, at retail.  Consequently, plaintiffs
cannot carry their burden of proof at step five of the test
articulated in <u>Cashmere & Camel Hair Mfrs.</u>, <u>supra</u>.


    B.   Injunctive Relief.

With respect to their federal claims against Murray,
plaintiffs seem to concede that the only relief to which they
might arguably be entitled is a prospective injunction.  <u>See,
e.g.</u>, Plaintiffs' Opposition Memorandum (document no. 79-13) at
9-10.  Similarly, because plaintiffs are not entitled under their
federal claims to an award of damages or attorneys' fees against
the Duerigs, the only remedy to which plaintiffs might arguably
be entitled with respect to them is prospective injunctive
relief.  But, as the Court of Appeals for the First Circuit has
observed:

> A preliminary injunction is an extraordinary and
> drastic remedy, that is never awarded as of right.
> Rather, as the Supreme Court recently reaffirmed, a
> plaintiff seeking a preliminary injunction must
> establish that he is likely to succeed on the merits,
> that he is likely to suffer irreparable harm in the
> absence of preliminary relief, that the balance of
> equities tips in his favor, and that an injunction is

in the public interest.

> The Supreme Court has repeatedly held that the basis
> for injunctive relief in the federal courts has always
> been irreparable injury and the inadequacy of legal
> remedies.  Thus, an injunction should issue only where
> the intervention of a court of equity is essential in
> order effectually to protect property rights against
> injuries otherwise irremediable.

Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc., 645
F.3d 26, 32 (1st Cir. 2011) (citations and internal punctuation
omitted).

While there is now some doubt about the irreparable injury
rule invoked by plaintiffs - i.e., that a copyright or trademark
plaintiff who demonstrates a likelihood of success on the merits
creates a presumption of irreparable harm - the availability of
injunctive relief in this case does not turn on that point.  See
Id. at 34; see also eBay Inc. v. MercExchange, L.L.C., 547 U.S.
388, 393-94 (2006).  Rather, even assuming the rule to still be
good law, "there is no parallel presumption that because such
infringements have occurred in the past, they will inevitably be
continued into the future."  American Bd. of Psychiatry &
Neurology v. Johnson-Powell, 129 F.3d 1, 4 (1st Cir. 1997).
Plaintiffs retain "the ordinary burden of showing a sufficient
likelihood that the infringing conduct would occur in the future
so as to give rise to an enjoinable threat of irreparable harm."
Id.

Plaintiffs completely fail on that score - it is highly unlikely that Murray will ever try to compete with PTC by manufacturing paper thermometers using PTC's trade secrets; it is equally unlikely that he will ever attempt to buy and resell PTC's products much less copy its website content.  The risk that Murray may repeat conduct said by plaintiffs to violate the Lanham Act or their copyrights is, as a practical matter, nonexistent.  The court declines to afford unnecessary injunctive relief.

Enjoining the Duerigs is also completely unjustified.  There is no evidence in this record from which it could be plausibly inferred that the Duerigs ever intended to manufacture (or assist Murray in manufacturing) temperature-sensitive labels in competition with PTC.  Nor is there any evidence suggesting a realistic possibility that they might decide to do so in the future.  Plaintiffs have not shown a likelihood of success on that claim.  Indeed, this record does not plausibly suggest that the Duerigs ever engaged in, or facilitated, or procured, or encouraged infringing activity by Murray.  Plaintiffs have, then, failed to meet their burden of showing that the Duerigs are likely to engage in conduct that will pose an enjoinable threat of irreparable harm.  If the Duerigs do engage in such behavior in the future, plaintiffs may seek enforcement of the covenant

not to compete (to the extent it proves enforceable) or, if appropriate, petition for injunctive relief based on something more than wishful speculation.

In summary, PTC and Loconti are not entitled to an award of damages, attorneys' fees, or injunctive relief against Murray or the Duerigs under either of the federal statutes invoked in their complaint.  Defendants, then, are entitled to judgment as a matter of law on plaintiffs' federal claims.  See, e.g., Am. Med. Sys. v. Biolitec, Inc., 774 F. Supp. 2d 375, 392 (D. Mass. 2011) ("The absence of sufficient evidence in the record to satisfy Plaintiff's burden on the fifth element of their Lanham Act claim [i.e., damages] compels the court to allow Defendants' motion for summary judgment on Count III.").

II.  Plaintiffs' State Law Claims.

In addition to their federal claims, plaintiffs also advance state common law and statutory claims against the Duerigs for breach of contract (i.e., the covenant not to compete), fraud, and theft of trade secrets.  Having resolved plaintiffs' federal claims in favor of defendants, the court would ordinarily consider a number of factors when deciding whether to exercise supplemental jurisdiction over plaintiffs' state law claims.  See generally 28 U.S.C. § 1367(c).  See also United Mine Workers v.

<u>Gibbs</u>, 383 U.S. 715, 726 (1966); <u>Camelio v. American Fed'n</u>, 137 F.3d 666, 672 (1st Cir. 1998).  Here, however, all parties have agreed that, under the circumstances presented, the court should decline to exercise supplemental jurisdiction.  <u>See</u> Transcript of Hearing held on December 22, 2011.


### Conclusion

For the foregoing reasons, as well as those set forth in Murray's memoranda, Murray's motion for summary judgment on all claims advanced against him (document no. 59) is granted.


The Duerig's motion for summary judgment (document no. 31) is granted in part, and denied in part, as follows.  The Duerigs are entitled to judgment as a matter of law on plaintiffs' federal claims under the Copyright and Lanham Acts.  Plaintiffs' state law claims against the Duerigs, however, are dismissed without prejudice as the court declines to exercise supplemental jurisdiction over them, consistent with the usual rule and the parties' express wishes.


Plaintiffs' motion to amend their complaint to include an additional state law cause of action (document no. 60) is denied as moot, as are the numerous motions in limine filed by the parties (documents no. 91, 92, 93, 95, 97, 98, 100, 101, 102,

103, 104, and 106) and plaintiffs' motion for an advisory jury
(document no. 105).


        The Clerk of Court shall enter judgment in accordance with
this order and close the case.

        **SO ORDERED.**

_____
Steven J. McAuliffe
District Judge

January 23, 2012

cc:  Gary E. Lambert, Esq.
     Victor H. Polk, Jr., Esq.
     William B. Pribis, Esq.
     Cameron G. Shilling, Esq.
     Cathryn E. Vaughn, Esq.